24CA0816 Peo in Interest of EMG 01-09-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0816
Delta County District Court No. 20JV35
Honorable Kimberly Karn, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of E.M.G. and E.Y.G., Children,

and Concerning C.N.G.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE KUHN
Harris and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 9, 2025

---

John F. Baier, County Attorney, Jodie L. Behrmann, Assistant County Attorney, Jason Wilson, Assistant County Attorney, Adriana Hartley, Assistant County Attorney, Delta, Colorado, for Appellee

Josie L. Burt, Counsel for Youth, Glenwood Springs, Colorado, for E.M.G.

Jenna L. Mazzucca, Counsel for Youth, Salida, Colorado, for E.Y.G.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     In this dependency and neglect proceeding, the juvenile court terminated C.N.G.'s (mother) parent-child legal relationships with E.M.G. and E.Y.G. (the children).  Mother appeals the juvenile court's termination judgment as to E.Y.G. only.  Her sole contention on appeal is that the court erred by finding that no less drastic alternative to termination existed.  We affirm.

## I.     Background

¶ 2     In December 2020, the Delta County Department of Human Services became involved with the family due to concerns about mother's substance abuse and reports that unsafe persons were in the family home while the children were present.  Additional concerns arose regarding mother's criminal activity, her failure to follow a safety plan, and reports she may abscond with the children.  Based upon these concerns, the Department initiated a petition in dependency and neglect.

¶ 3     Mother admitted to the allegations in the petition and the juvenile court adjudicated the children dependent and neglected.  The court then adopted a treatment plan for mother.

¶ 4 Mother was initially compliant with the treatment plan. The children were eventually returned to her care, and the Department moved to dismiss the case.

¶ 5 However, a few months after the motion to dismiss was filed, mother was involved in a domestic violence incident during which the children were present. E.Y.G. was accidentally injured during this incident because of mother's actions. Because of this, the Department withdrew its motion, the children were removed from mother's care, and mother's treatment plan was amended to include requirements that she seek anger management, therapy, and domestic violence counseling.

¶ 6 In October 2023, the Department moved to terminate parental rights. The juvenile court held an evidentiary hearing in March 2024. The court issued its findings of fact and conclusions of law the next month, granting the Department's motion and terminating parental rights.[1]

---

[1] The children's father did not appeal the termination judgment.

## II.    Analysis

¶ 7    Mother contends that the juvenile court erred by finding that there were no less drastic alternatives to termination of her parental rights.  We disagree.

### A.    Standard of Review and Applicable Law

¶ 8    Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves the application of the termination statute to evidentiary facts.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15.  A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo.  *M.A.W. v. People in Interest of A.L.W.*, 2020 CO 11, ¶ 31.

¶ 9    However, we review the court's factual findings for clear error and will not disturb them if they are supported by the record.  *Id.* at ¶ 32; *see also A.M.*, ¶ 15.  "The credibility of the witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions to be drawn from the evidence are within the discretion of the [juvenile] court."  *A.M.*, ¶ 15.

¶ 10     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change in a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 11     The juvenile court must consider and eliminate less drastic alternatives before terminating parental rights. *People in Interest of M.M.*, 726 P.2d 1108, 1122-23 (Colo. 1986). When making this determination, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *See* § 19-3-604(3); *People in Interest of K.B.*, 2016 COA 21, ¶ 35.

¶ 12     For a less drastic alternative to be viable, it must do more than "adequately" meet a child's needs. *A.M.*, ¶ 27. Rather, the proposed alternative must be the "best" option for the child. *Id.* Therefore, if the court considers a less drastic alternative but finds that termination is in the child's best interests, it must reject the proposed alternative and order termination. *Id.* at ¶ 32. Permanent placement is not a viable less drastic alternative if the child needs a

stable, permanent home that can only be assured by adoption.
*People in Interest of S.N-V.*, 300 P.3d 911, 920 (Colo. App. 2011).

¶ 13    When the juvenile court considers a less drastic alternative and still determines that the termination of parental rights is in the child's best interests, we must affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

> B.    The Juvenile Court Didn't Err by Finding
> No Less Drastic Alternatives to Termination
> of Mother's Parental Rights as to E.Y.G.

¶ 14    Mother asserts that the juvenile court erred when it found that there were no less drastic alternatives to termination because the court could have allowed mother additional time to work on her treatment plan, which would have allowed her to reunite with E.Y.G.[2]

¶ 15    However, the court did consider allowing more time for mother to comply with her treatment plan. It found that this was "not an

---

[2] E.M.G. filed a brief in this case "[i]n an abundance of caution that the arguments raised on appeal could jeopardize the underlying termination to E.M.G." We conclude that mother only challenges the termination judgment as to E.Y.G. Accordingly, we do not further address E.M.G.'s arguments.

option," given mother's lack of treatment plan compliance, the length of time the case had been open, and the lack of a secure attachment relationship between mother and the children. The court further found that "[m]other [was] literally not doing anything to comply with her treatment plan" and that she was unfit. The record supports the court's findings.

¶ 16    The record shows that, as noted, mother originally complied with portions of her treatment plan. But after the Department moved to withdraw its motion to dismiss the case in April 2022, mother ceased engaging in services. By the time of the termination hearing, mother had not engaged in any services in the fifteen months prior to the termination hearing, had not demonstrated progress in abstaining from substance use, and had inconsistent visits with the children.

¶ 17    Specifically, mother failed to comply with numerous aspects of her treatment plan. She did not participate in moral recognition therapy, dialectical behavior therapy, or domestic violence and substance abuse treatment. And she did not complete urinalysis tests (UAs) as often as her treatment plan required. When she did provide UAs or hair follicle tests, they were frequently positive for

methamphetamines. She further admitted that she had used methamphetamine as recently as two weeks prior to the termination hearing.

¶ 18 Moreover, the record shows that out of thirty-nine possible family time visits with the children, mother missed twenty-two. Indeed, at the time of the termination hearing, she had not seen the children in at least four months.

¶ 19 Mother argues that termination was nonetheless not in E.Y.G.'s best interests because E.Y.G. was not in a permanent placement. While a child's placement is relevant to the termination decision, it is not dispositive.

¶ 20 Rather, the termination statute requires a court to give primary consideration to the child's physical, mental, and emotional conditions and needs. *See* § 19-3-604(3); *K.B.*, ¶ 35. Evidence that a child is in a permanent placement is relevant to those needs and may be considered at a termination hearing. But permanency is not an absolute requirement that must be satisfied *before* a court can terminate parental rights. *See* § 19-3-604. Rather, placement is an issue that the court must consider "[f]ollowing an order of termination." § 19-3-605(1), C.R.S. 2024.

¶ 21    And while it's true that the court must consider the child's best interests in determining whether less drastic alternatives exist, the record shows that the juvenile court did so here. *See A.M.*, ¶ 27, *B.H.*, ¶ 80.

¶ 22    The court explicitly found termination to be in the children's best interests. In doing so, the court found that an allocation of parental responsibilities (APR) wasn't in the best interests of the children because it wouldn't "provide the children with permanency and the stability they need"; there was no secure attachment between mother and the children; E.Y.G.'s behaviors had increased due to her "limbo" status; and E.Y.G. was "willing to sacrifice herself to help [m]other." These findings are supported by the record.

¶ 23    The caseworker — who was qualified as an expert in child welfare and child protection — testified that the children "needed more of a permanency" than what an APR could offer. The caseworker also testified that the strained relationship between mother and the children was a barrier to permanency. She opined that the children had an "unsecure attachment" with mother because they were afraid to talk to mother due to fear of retaliation

or anger. And as the caseworker stated, the children did not feel like they could be safe with mother in the family home.

¶ 24 To illustrate this last point, the caseworker recounted a report of E.Y.G.'s encounter with a man who made inappropriate sexual advances towards her and mother reportedly dismissing the behavior as a joke. The incident had such an impact on E.Y.G. that, after a later chance encounter with the man, she needed to be placed in a qualified residential treatment program due to mental health concerns.

¶ 25 True, E.Y.G. testified at the termination hearing that she was not willing to be adopted and did not want mother's parental rights to be terminated. But E.Y.G. also gave testimony suggesting that such an outcome wouldn't be in her best interests. For example, she testified that she wanted to protect her mother and did not care if her mother was sober or if her mother could protect her. And she further acknowledged that living with her mother would not help her but again expressed that she did not care about the potential impact to herself.

¶ 26 And notably, while E.Y.G. opposed adoption and termination of mother's parental rights in the juvenile court, she asks us to affirm the termination on appeal.

¶ 27 Considering this record, then, we conclude that the juvenile court did not err by finding that there were no less drastic alternatives to termination of mother's parental rights. *See B.H.*, ¶ 80.

### III.   Disposition

¶ 28 The judgment is affirmed.

JUDGE HARRIS and JUDGE YUN concur.